IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **EVELYN R. BALDWIN**, | Case No. 6:13-cv-00527-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CAROLYN W. COLVIN**, | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

John E. Haapala, Jr., 401 E. Tenth Avenue, Suite 240, Eugene, OR 97401. Of Attorney for Plaintiff.

S. Amanda Marshall, United States Attorney, and Ronald K. Silver, Assistant United States Attorney, U.S. Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204; John C. LaMont, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

PAGE 1 – OPINION AND ORDER

Ms. Evelyn R. Baldwin ("Baldwin") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Baldwin's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. For the reasons stated below, the decision is affirmed.

## STANDARDS

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means "more than a mere scintilla but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment for that of the Commissioner. *See Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted)). A reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Id.*; *see also Bray*, 554 F.3d at 1226.

# BACKGROUND

### A. Baldwin's Application

Baldwin was born on April 7, 1973 and is 41 years old. AR 215. Baldwin graduated from high school and attended some college, but stopped school to care for her children. AR 225, 419. Baldwin's past employment includes work as a cashier, call center operator, shipper receiver, housekeeper, and cash clerk. AR 220, 245. Baldwin has five children, of which two are in her care, two are in foster care, and one is an adult. AR 418, 772, 813. Baldwin reported that she stopped working on January 7, 2007, due to chronic pain and swelling in her legs. AR 219.

In March 2009, Baldwin filed a Title XVI application for SSI and a Title II application for DIB. AR 173-79, 215. Baldwin completed her applications on April 21, 2009. AR 173. Baldwin alleges disability based on her chronic pain, depression, migraine headaches, scoliosis, arthritis, asthma, a heart murmur, and a reading disability. AR 219. She states that the medications that she takes for her illnesses, injuries and conditions make her "so drowsy [she] can't function as a parent." *Id.* Baldwin alleged disability beginning on January 7, 2007. AR 18, 215. Baldwin's date last insured is December 31, 2008. AR 18.

The Commissioner denied Baldwin's application initially and upon reconsideration; thereafter, Baldwin requested a hearing before an Administrative Law Judge ("ALJ"). AR 18, 79-98. Baldwin appeared for a hearing on May 3, 2011 and was represented by counsel. AR 61-68. The ALJ continued the matter to permit Baldwin's counsel more time to prepare and investigate Baldwin's case. AR 65-67. At a hearing held on July 25, 2011, the ALJ heard testimony from Baldwin, medical expert Margaret Moore, Ph.D., and vocational expert ("VE") Amber Leah Ruck. AR 36-60. On August 4, 2011, the ALJ issued a decision finding that Baldwin was not disabled within the meaning of the Social Security Act. AR 15-29.

Baldwin petitioned the Appeals Council for review of the ALJ's decision. AR 13, 15.

Baldwin submitted exhibits and post-decision evidence to the Appeals Council. AR 15, 711-835.

On January 22, 2013, the Appeals Council denied the request for review, making the ALJ's

decision the final decision of the Commissioner. AR 1-7. The Appeals Council found that

Baldwin submitted medical evidence relating to the period after the ALJ's decision on August 4,

2011, and that those records did "not affect the decision about whether [Baldwin was] disabled

beginning on or before August 4, 2011." AR 2. Baldwin now seeks judicial review of that

decision.

## B.  The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted or

can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.

§ 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for

determining whether an applicant is disabled within the meaning of the Social Security Act."

*Keyser v. Comm'r Soc. Sec. Admin.,* 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R.

§ 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each

step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five-step

sequential process asks the following series of questions:

1.    Is the claimant performing "substantial gainful activity?" 20 C.F.R.
       §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). This activity is work involving
       significant mental or physical duties done or intended to be done for pay
       or profit. 20 C.F.R. §§ 404.1510, 416.910. If the claimant is performing
       such work, she is not disabled within the meaning of the Act. 20 C.F.R.
       §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not performing
       substantial gainful activity, the analysis proceeds to step two.

2.    Is the claimant's impairment "severe" under the Commissioner's
       regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An

impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.      Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.      Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.      Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c), 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant

PAGE 5 – OPINION AND ORDER

numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566, 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

**C.  The ALJ's Decision**

The ALJ found that Baldwin meets the insured status for DIB benefits through December 31, 2008. AR 18. The ALJ then applied the sequential process. At step one, the ALJ found that Baldwin had not engaged in substantial gainful activity since the alleged onset date of January 7, 2007. AR 20. At step two, the ALJ found that Baldwin had the following severe impairments: "asthma, obesity, degenerative joint disease of both knees, scoliosis, depression, anxiety, and personality disorder." *Id.* The ALJ found that other symptoms and complaints in Baldwin's medical treatment records were not more than transient and did not cause significant vocational limitations and therefore, were not severe impairments. AR 21. At step three, the ALJ ruled that Baldwin did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the regulations. *Id.*

The ALJ next assessed Baldwin's RFC. The ALJ found that Baldwin retained the capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). AR 23. Specifically, the ALJ found that Baldwin: (1) could "lift twenty pounds occasionally and ten pounds frequently;" (2) could "stand and walk no more than two hours of an eight-hour workday;" (3) had "no limitation on sitting;" (4) should do "no climbing of ladders, ropes, and scaffolds;" (5) could "occasionally climb ramps and stairs;" (6) could "occasionally stoop,

PAGE 6 – OPINION AND ORDER

crouch, kneel, and crawl;" (7) should have "no concentrated exposure to noxious fumes or odors;" (8) should "perform only unskilled and low semi-skilled work;" (9) could have "only occasional interaction with co-workers;" and (10) may not have "interaction with the general public." *Id.*

In formulating the RFC, the ALJ found that Baldwin's "allegations ha[d] limited credibility." AR 24. The ALJ gave the physical RFC assessment of Dr. Richard Alley, MD, "significant weight" because it was consistent with the objective medical evidence. AR 25. The ALJ also gave "significant weight" to the assessment of Dr. Jill Spendal, PsyD, because her clinical assessment was both comprehensive and consistent with the other medical evidence in the record. AR 26, 417-33. The ALJ also heard testimony at the hearing from an impartial medical expert, Dr. Moore, in order to assess Baldwin's mental impairments. *Id.* The ALJ gave Dr. Moore's testimony  "significant weight" because it was consistent with the medical opinion of Dr. Spendal and the other medical evidence, and because Dr. Moore was "the only medical professional who ha[d] reviewed all the evidence." AR 26-27.

At step four, the ALJ determined that Baldwin's RFC rendered her unable to perform her past relevant work. AR 27. At step five, based on the testimony of a VE, the ALJ concluded that Baldwin could perform jobs as a stuffer or waxer that exist in significant numbers in the national economy. AR 28. Thus, the ALJ ruled that Baldwin is not disabled. *Id.*

## DISCUSSION

Baldwin argues that the ALJ erred by: (1) failing to list as a severe impairment at step two Baldwin's diagnosis of fibromyalgia; (2) ignoring the medical opinion evidence of fibromyalgia later in the sequential analysis; (3) improperly rejecting Baldwin's subjective symptom testimony; and (4) improperly formulating an RFC that failed to reflect all of Baldwin's limitations. Each argument will be addressed in turn.

PAGE 7 – OPINION AND ORDER

**A.  Exclusion of Fibromyalgia at Step Two**

Baldwin argues that the ALJ erred by failing to find at step two of the sequential analysis that her fibromyalgia, a diagnosis Baldwin received on July 13, 2012, was a severe impairment. The ALJ attributed Baldwin's alleged pain in her legs primarily to her knees, finding that Baldwin's degenerative joint disease of both knees was a severe impairment. *See* AR 395-416 (citing the X-rays and Magnetic Resonance Imaging ("MRI") studies from Legacy Clinics Limited to conclude that beginning in 2008, Baldwin had mild osteoarthritis of the left knee and early degenerative joint disease of the right knee).

The step two inquiry is a *de minimis* screening device used to dispose of groundless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Baldwin has the burden of proving she has a severe impairment at step two of the sequential evaluation process. 20 C.F.R. § 416.912(a)(c). In order to meet this burden, Baldwin must furnish medical and other evidence that shows that she has a severe impairment. *Id.* The regulations, 20 C.F.R. §§ 404.1520(c), 416.920(c), provide that an impairment is severe if it significantly limits one's ability to perform basic work activities. An impairment is considered non-severe if it "does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). When the ALJ finds any of a claimant's impairments to be severe, the ALJ continues with the sequential analysis, considering the effect of all of the claimant's impairments, whether severe or non-severe. Social Security Ruling ("SSR") 96–9p, *available at* 1996 WL 374184, at *5. Therefore, reversible error occurs only when a severe impairment erroneously excluded at step two caused additional functional limitations not accounted for in the RFC assessment. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

Here, at the step two analysis, the ALJ found some of Baldwin's impairments to be severe and continued to subsequent steps in the sequential analysis. Baldwin's argument

challenging the ALJ's failure to include the fibromyalgia diagnosis at step two fails because there was no medical evidence demonstrating that fibromyalgia was a severe impairment during the relevant time period. Moreover, the ALJ considered all of Baldwin's relevant impairments in the RFC, and thus there was no error.

It is important to note at the outset that Baldwin's application for benefits alleges disability due to chronic pain, depression, migraine headaches, scoliosis, arthritis, asthma, a heart murmur, and a reading disability. AR 219. Baldwin did not allege disability due to fibromyalgia in her application for benefits. Further, during the administrative hearing, Baldwin stated that she was in pain the morning of the hearing because her "legs [were] bothering [her] really bad." AR 48. Baldwin also stated that she was unable to work because even while sitting in the hearing, her "legs [were] hurting [her] and [she] need[ed] to stand up." AR 50. But if she stood up, she would have to "pop her legs back into place." *Id.* She described that both sitting and standing are hard on her legs. *Id.* Baldwin contextualized her knee pain and said that she has had problems beginning when she was 18 years old and that her knee pain had been getting worse. AR 55. Based on the application and hearing, Baldwin's explanation of her chronic pain was limited to her legs.

Baldwin argues that the ALJ failed to consider the medical opinion evidence of Dr. Robert Henriques, MD, and his alleged diagnosis of fibromyalgia. AR 727. The Court notes that the diagnosis Baldwin cites in the record is from Baldwin's office visit on July 13, 2012 with Dr. Karen M. Erde, MD, and not Dr. Henriques. *See* AR 726-27. This medical evidence was not before the ALJ, but instead, was developed after the ALJ's decision and presented to the Appeals Council. The Appeals Council considered the additional evidence and found that the records

related to a period after the ALJ's decision dated August 4, 2011.[1] AR 2. Because of this, the

Appeals Council concluded that Dr. Erde's diagnosis did not affect the ALJ's decision about

whether Baldwin was disabled beginning on or before August 4, 2011. *Id.* Baldwin does not

disagree that she must establish disability on or before August 4, 2011.

        The evidence that Baldwin submitted to the Appeals Council does not demonstrate that

she had a severe impairment due to fibromyalgia during the relevant period. *See Grey v.*

*Barnhart*, 123 F. App'x 778, 780 (9th Cir. 2005) (holding that newly submitted evidence to the

Appeals Council did not demonstrate a severe impairment because the medical evidence was

dated after the ALJ's decision and did not "provide [] any detail about . . . the onset of [the

claimant's] mental illness"). After making her diagnosis, Dr. Erde stated that she "explained in

some depth that fibromyalgia is a central processing defect, not a muscle pathology, that is best

treated with exercise and flexibility training." AR 727. Dr. Erde also prescribed a treatment plan

for Baldwin. *Id.* Dr. Erde did not comment on the alleged onset date of Baldwin's fibromyalgia.

Before Dr. Erde's diagnosis on July 13, 2012, AR 726, but after the ALJ's decision on August 4,

2011, Dr. Joseph Black noted that some of the symptoms Baldwin presented were not symptoms

she had experienced in previous years. *See* AR 729. This medical evidence indicates that the

symptoms Baldwin experienced after the ALJ's decision are not necessarily representative of the

period of disability relevant to her applications for benefits.

        The RFC does not include a specific work limitation related to Baldwin's alleged

fibromyalgia. AR 23. In this case, however, the ALJ was not required to include such a limitation

---

[1] Where the claimant submits evidence after the ALJ's decision, the "administrative record includes evidence submitted to and considered by the Appeals Council." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162-63 (9th Cir. 2012).

because Baldwin did not provide sufficient evidence to show that the fibromyalgia diagnosis was relevant to her period of disability. *See Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). The medical evidence that the ALJ did consider related to Baldwin's leg pain and pointed only to Baldwin's severe impairment related to her knees. *See* AR 395-416 (Legacy Clinics Limited records). Moreover, the evidence cited by Baldwin focuses on her leg and knee pain, and does not, as Baldwin argues to this Court, focus on chronic pain or the type of symptoms associated with fibromyalgia. *See, e.g.*, AR 604 (record from Dr. Joseph Black, MD, documenting Baldwin's knee pain); AR 502 (record from Dr. Black documenting Baldwin's left knee and leg pain); AR 283 (Baldwin reporting pain, swelling, and bruises around her knees); AR 538 (record from Dr. David Noall, MD, documenting Baldwin's knee pain). The ALJ also was not presented with evidence of fibromyalgia, and thus was not required to determine whether fibromyalgia was a possible severe limitation or should have been included in Baldwin's RFC. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (reasoning that the duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence"). The ALJ, therefore, did not err in failing to list at step two fibromyalgia as a severe impairment.

**B. Medical Opinion Evidence of Fibromyalgia**

Baldwin also argues that the ALJ erred by failing to consider and discuss the medical evidence of Baldwin's fibromyalgia.[2] *See* AR 20-23, 727. The Commissioner responds that the ALJ was not required to consider Dr. Erde's fibromyalgia diagnosis because her examination of Baldwin and treatment notes were generated on July 13, 2012, almost a year after the ALJ's decision. *See* AR 2, 29, 726-27.

---

[2] Baldwin cites to the medical opinion of Dr. Henriques. The diagnosis of fibromyalgia cited by Baldwin, however, relates to the treatment notes from Dr. Erde as previously noted.

The central question before the Court is not whether the ALJ ought to have considered Baldwin's fibromyalgia diagnosis or the treatment notes from Dr. Erde. Instead, the relevant question is whether Baldwin's fibromyalgia diagnosis from after the relevant time period would alter the ALJ's disability determination.

Although the Court cannot review the Appeals Council's decision, *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161-62 (9th Cir. 2012), the Court may consider new evidence added to the record when determining whether the ALJ's conclusion was supported by substantial evidence. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231-33 (9th Cir. 2011). Pursuant to *Taylor*, it is appropriate for a court to order remand based on its review of new evidence. *Id.* at 1232 (stating that the Court may "consider [a] physician's opinion, which was rejected by the Appeals Council, to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error").

In this case, however, the Appeals Council determined that "the additional medical evidence in Exhibits 28F [AR 718-67] and 29F [AR 768-835] include[d] records relating to the period after the Administrative Law Judge decision dated August 4, 2011." The citation to Dr. Erde's medical opinion was submitted as Exhibit 28F to the Appeals Council and consisted of medical documents from the Multnomah County Health Department from June 28, 2011 through August 9, 2012. In the summary of Baldwin's "Problem List," fibromyalgia is listed as being first "noted" (or documented) on July 13, 2012. AR 722. Dr. Erde's July 13, 2012 evaluation diagnosing Baldwin with fibromyalgia is the only evaluation from Dr. Erde in Exhibit 28F. Unlike the fibromyalgia diagnosis, several of Baldwin's other diagnoses indicate being first noted within the relevant time period, such as Baldwin's abnormal vaginal bleeding, sterilization, other chronic pain related to Baldwin's bilateral knee injury, knee osteoarthritis,

lumbago, obesity, and mild persistent asthma. AR 722-23. These earlier records do not demonstrate that Baldwin was also suffering from fibromyalgia during the relevant time period and do not directly relate to that diagnosis.

Moreover, unlike the scenario addressed in *Taylor*, where the medical testimony submitted to the Appeals Council for the first time encompassed the period beginning with the date of disability, there is no indication that Dr. Erde's fibromyalgia diagnosis is applicable before July 13, 2012. *Cf. Taylor*, 659 F.3d at 1232. It is also unclear whether Dr. Erde's diagnosis concerned the physical conditions and symptoms that had been addressed by other doctors at the Multnomah County Health Department. *Cf. id.* (explaining that the Commissioner did not "contest that [the omitted doctor's] opinion concerns the status of [the claimant's] mental impairments and limitations before the expiration of his insured status"). Fibromyalgia is indicated as a separate diagnosis, and although Baldwin now argues that her underlying condition was always fibromyalgia, that assertion is not supported by the objective evidence in the record.

In sum, the new evidence submitted to the Appeals Council does not contradict the conclusions drawn by the ALJ because the fibromyalgia diagnosis is from a time after the date of the ALJ's decision and does not discuss or relate to a medical diagnosis during the applicable disability period. Thus, the ALJ's decision is based on substantial evidence.

## C. Baldwin's Credibility

Baldwin argues that the ALJ erred by discrediting her symptom testimony and testimony regarding her limitations. Pl.'s Br., ECF 18 at 10-13. There is a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying

impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (citation and quotation marks omitted). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282.

Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other

symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

Further, an ALJ also "may consider . . . ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen*, 80 F.3d at 1284. The ALJ's credibility decision may be upheld overall even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld. *See Batson*, 359 F.3d at 1197.

Baldwin asserts that she has the following illnesses, injuries, or conditions that limit her ability to work: (1) chronic pain; (2) depression; (3) migraines/headaches; (4) scoliosis; (5) arthritis in both legs; (6) reading disability; (7) asthma; and (8) a heart murmur. AR 219. Baldwin indicated that these illnesses, injuries, or conditions affect her ability in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, memory, completing tasks, concentration, understanding, and getting along with others. AR 274. At the administrative hearing, Baldwin testified that pain interrupts her sleep, that she cannot focus or concentrate for an eight-hour period, and that her knee pain makes it difficult for her to stand for any pronged periods. AR 23-24, 48-56. Baldwin also testified that she suffers from asthma, obesity, depression, and at times cannot be around other people. *Id.*

The ALJ, applying the first step of the credibility framework, found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 24. In applying the second step, however, the ALJ concluded that Baldwin's "allegations have limited credibility." *Id.* In support of his credibility finding, the ALJ offered

several specific reasons: (1) Baldwin's "activities of daily living show that she is less limited

than alleged"; (2) Baldwin "received conservative treatment for her impairments" and was in

poor compliance with her treatment plans; and (3) the medical evidence was inconsistent with

Baldwin's allegations of disabling impairments and no treating or examining physician opined

that Baldwin was disabled or had more limitations than those noted in the ALJ's decision. The

Commissioner argues that the ALJ's decision is supported by substantial evidence on all grounds

except the ALJ's finding that Baldwin was in poor compliance with her prescribed treatment.

Def.'s Resp. Br., ECF 19 at 12 n.1. The Court finds that the remaining reasons cited by the ALJ

are supported by substantial evidence in the record and provide independent bases for upholding

the ALJ's credibility determination.

### 1.  Activities of Daily Living

The ALJ found that Baldwin's activities of daily living were inconsistent with her claim

of disability. AR 24. Daily activities can form the basis of an adverse credibility finding where

the claimant's activities either contradict his or her other testimony or meet the threshold for

transferable work skills. *See Orn*, 495 F.3d at 639; *Molina v. Astrue*, 674 F.3d 1104, 1112-13

(9th Cir. 2012). For a credibility analysis, the ALJ "need not consider whether a claimant's daily

activities are equivalent to full-time work; it is sufficient that the claimant's activities 'contradict

claims of a totally debilitating impairment.'" *Whittenberg v. Astrue*, 2012 WL 3922151, at * 4

(D. Or. Aug. 20, 2012) (quoting *Molina*, 674 F.3d at 1113); *see also Denton v. Astrue*, 2012 WL

4210508, at *6 (D. Or. Sept. 19, 2012) ("While [claimant's] activities of daily living do not

necessarily rise to the level of transferable work skills, they do contradict his testimony regarding

the severity of his limitations."). A claimant, however, need not be utterly incapacitated to

receive disability benefits, and sporadic completion of minimal activities is insufficient to

support a negative credibility finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001);

*see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (requiring the level of activity be inconsistent with the claimant's claimed limitations to be relevant to his or her credibility).

In October 2008, Baldwin began volunteering at the Alberta office of the Oregon Department of Human Services ("DHS"). AR 419. She worked four days a week, or approximately 32 hours a week, and answered phone calls, filed documents, and handled mail. *Id.* Baldwin "stated no difficulties with concentration on the job," described her volunteer work as "job training" and hoped that she would be hired at DHS in a paid position. *Id.* The ALJ also noted that in that same year, Baldwin was "attending school, doing two internships, acting as a mentor, and volunteering as a spokesperson for the Healthy Birth Initiative." AR 24, 585. In addition, the ALJ cited to Baldwin's ability to care for her children, cook, play cards, crochet, clean, and attempt to regain custody of two of her children. AR 24, 654. Baldwin argues that her ability to care for her children was limited because they have been taken away from her for brief periods of time and she required assistance completing basic chores around her house. Pl.'s Br., ECF 18 at 10-12; AR 446. Regarding her attempt to regain custody of two of her children, Baldwin argues that her compliance with therapy sessions does not undermine her disability testimony. Baldwin also argues that her unsuccessful effort to attempt to obtain employment through DHS is not a clear and convincing reason to discredit her testimony. *Id.*

The written records of daily living documented by the ALJ are in conflict with Baldwin's testimony that her illnesses, injuries, or impairments render her totally disabled. Despite Baldwin's testimony to the contrary, her work with DHS demonstrates that she can perform work in a generally sedentary job and that she is able to concentrate on work-related tasks. Baldwin provides no explanation of why she stopped volunteering at DHS. Moreover, Baldwin's daily activities of caring for her children and performing basic chores, although limited by her

knee injury, AR 446, are inconsistent with a completely debilitating impairment, even if they do

not rise to the level of transferable work skills. *See Molina*, 674 F.3d at 1113. Although Baldwin

argues that her lack of custody of her twins is evidence of her disability, the evidence

demonstrates that a primary reason for DHS's continued denial of custody is that the two

children have attention deficit hyperactivity disorder and require special care. AR 418, 772, 813.

Baldwin's continued inability to regain custody of her two children in foster care does not

undermine the evidence cited by the ALJ that Baldwin was more capable than she described in

her oral testimony.

Considering the evidence cited above, the ALJ's reliance on Baldwin's activities of daily

living was a clear and convincing reason to find her not credible with regard to her symptom

testimony.

### 2.  Conservative Treatment

The ALJ also considered the conservative course of treatment in rejecting Baldwin's

credibility.[3] Conservative treatment can be considered when evaluating credibility regarding

allegations of debilitating pain. *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (stating

that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony

regarding severity of an impairment"); *Johnson*, 60 F.3d at 1434 (holding that the ALJ properly

considered the absence of medical treatment for allegedly debilitating back pain and the doctor's

---

[3] The Commissioner does not defend the ALJ's reasoning that Baldwin failed to comply with her treatment plan. The Court, therefore, does not rely on or evaluate this reason for rejecting Baldwin's credibility. So long as the remaining reasons for rejecting Baldwin's credibility are supported by substantial evidence, the ALJ's potential error on this issue is harmless. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (reasoning that "[s]o long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal" (alteration in original) (citations and quotations marks omitted)).

prescription of conservative treatment in discounting the credibility of claimant's pain

testimony). If, however, the claimant has a good reason for not seeking more aggressive

treatment, conservative treatment is not a proper basis for rejecting the claimant's credibility.

*Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

      The ALJ found that Baldwin had "received conservative treatment for her impairments."

AR 24. Baldwin argues that the treatment "was not conservative, so much as it was ineffective."

Pl.'s Br., ECF 18 at 12. Regarding Baldwin's knee pain, X-rays completed in 2008 showed

scoliosis, osteoarthritis of the left knee, and osteoarthritis of the right knee. AR 395-406. To

remedy Baldwin's knee and leg pain, Baldwin received a short-term prescription for Vicodin,

was told to wear a knee brace, and use crutches as needed. AR 471. In September 2008, a

physician's assistant, George Van Meter P.A.-C, found that Baldwin had subluxation of the

patella, especially in the right knee, and suggested muscle strengthening, physical therapy,

weight loss, and a knee sleeve. AR 539. Mr. Van Meter also recommended a Palumbo knee

brace and physical therapy, which Baldwin did not follow through with because she said they

would not be covered by her insurance. AR 536, 538. In October 2009, Dr. Noall, an orthopedist,

also recommend that Baldwin pursue an exercise program and a knee sleeve. AR 537. Baldwin

rejected Dr. Noall's offer to "instruct [Baldwin] in a quad sets program" and was "not willing to

look into options for [a knee brace]." *Id.* Dr. Noall concluded that Baldwin's obesity prevented

Dr. Noall from evaluating effusion. *Id.*

      Dr. Joseph Black evaluated Baldwin in March 2010 regarding her knee pain. AR 605.

Dr. Black recommended that Baldwin continue to lose weight and that there was "little

additional to offer [Baldwin] at this point." *Id.* Dr. Black's notes in the following months

indicated that Baldwin had been to see an "ortho [Dr. Noall] without much available intervention

for relief" and that Baldwin had "recently seen ortho, no alternative management plan made."
AR 601, 605. The notes regarding the orthopaedic doctor indicate that an orthopedist would not
solve Baldwin's knee pain. In December of 2010, Dr. Black documented giving Baldwin a
cortisone shot in her left knee to assist with pain. AR 597. Baldwin reported to Dr. Laura Davies,
MD, that the cortisone shot had reduced Baldwin's pain for four months. AR 617.

Baldwin contends that Dr. Erde's fibromyalgia diagnosis is the better explanation
regarding the treatment she received, and that this diagnosis finally provided her with the correct
treatment plan. Pl's Br., ECF 18 at 13. This argument is without merit. Not only was the
fibromyalgia diagnosis made after the relevant time period and does not clearly relate back to the
alleged period of disability, see *supra* Section A-B, but the fibromyalgia treatment plan is
strikingly similar to the treatment plan prescribed by Mr. Van Meter, Dr. Noall, and Dr. Black.
Dr. Erde noted that Baldwin's fibromyalgia is "best treated with exercise and flexibility training"
and that Baldwin should have "a year round gentle exercise program for most days." AR 727.
When Baldwin visited Dr. Erde in July 2012, Baldwin had lost 100 pounds since 2010, *id.*,
which indicates that her continued focus on physical exercise was the proper treatment for her
leg pain. *Id.* The ALJ's conclusion that Baldwin was not disabled is supported by this evidence.
*See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

This medical evidence provides substantial support for the ALJ's decision. Despite
Baldwin's alleged knee pain, Baldwin's successful treatment was predicated on a conservative
medical treatment plan, which ultimately improved her condition. *See* AR 727 (documenting that
in 2012 Baldwin was able to walk 30 to 50 minutes daily). This type of conservative treatment
and response by Baldwin is sufficient to discount Baldwin's testimony regarding the severity of
her impairment. *See Tommasetti*, 533 F.3d at 1039-40 (finding that the claimant's positive

response to conservative treatment including "physical therapy, the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset . . . . undermines [the claimant's] reports regarding the disabling nature of his pain").

### 3. Medical Evidence

The ALJ also found Baldwin's subjective testimony regarding her symptoms not credible because it contradicted the medical evidence in the record. AR 24-25. A claimant's inconsistent or non-existent reporting of symptoms is competent evidence for an ALJ to consider when making a credibility assessment. *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

The medical evidence supported the finding that Baldwin had a severe limitation in her mobility, but did not support Baldwin's claim that her knee and leg pain was completely debilitating. The ALJ's reasoning in reaching this conclusion is supported by substantial evidence. As noted above, Dr. Black, Dr. Noall, and Dr. Davies documented Baldwin's mobility limitations, but none found that Baldwin was unable to get around whatsoever or that she could not sit and perform sedentary work. AR 536-39, 597-605. Baldwin was able to engage in primarily sedentary work with DHS during the relevant time period, which shows that she can complete work that involves limited mobility. AR 419. Moreover, Dr. Alley completed a physical RFC assessment for Baldwin in June 2009. Dr. Alley concluded that Baldwin's description of knee pain was fully credible and Dr. Alley gave Baldwin a sedentary RFC. AR 443. Because of this, Dr. Alley noted that Baldwin could only occasionally engage in climbing, balancing, stooping, kneeling, crouching, and crawling. AR 438. Baldwin's ability to stand or walk was also limited to a total of two hours a day in an eight-hour workday. AR 437.

There is substantial evidence in the record to support the ALJ's reliance on the medical reports that consistently documented Baldwin's limited ability to use her legs despite her knee

injuries. Thus, Baldwin's claim of complete disability is inconsistent with the medical evidence. *See Parra*, 481 F.3d at 750-51.

**D.  The ALJ's RFC Formulation and Step Five Analysis**

Baldwin makes three arguments challenging the ALJ's formulation of her RFC. Baldwin contends that the ALJ failed to account for all of Baldwin's limitations and that as a result, the hypothetical relied on by the VE at step five was faulty. Pl.'s Br., ECF 18 at 13-16.

An ALJ must consider "all of [a claimant's] medically determinable impairments," including "medically determinable impairments that are not 'severe,'" in making an RFC determination. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The ALJ is required to assess work-related activities that can be performed on a "regular and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c). SSR 96-8p explains that the RFC should be the *most* an individual can do despite limitations and impairments. SSR 96-8p, *available at* 1996 WL 374184, at *4. Further, the "RFC assessment considers only functional limitations and restrictions that result from an individual's *medically determinable* impairment or combination of impairments, including the impact of any related symptoms." *Id.* at *1 (emphasis added); *see also* 42 U.S.C. § 423(d)(3); 20 C.F.R. § 404.1528(b)-(c). "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). An ALJ's findings, however, need only be consistent with relevant assessed limitations and not identical to them. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222-23 (9th Cir. 2010) (holding that there is no conflict to resolve when an ALJ incorporates limitations that are "entirely consistent," if not identical, to a doctor's assessed limitations into the RFC); *Batson*, 359 F.3d at 1198 (finding that substantial evidence supported ALJ's RFC determination because the limitations included in the RFC were "consistent with"—albeit not identical to—the examining therapist's).

PAGE 22 – OPINION AND ORDER

The ALJ found that Baldwin had the following RFC:

> Lift twenty pounds occasionally and ten pounds frequently; stand
> and walk no more than two hours of an eight-hour workday; no
> limitation on sitting; no climbing of ladders, ropes, and scaffolds;
> occasionally climb ramps and stairs; occasionally stoop, crouch,
> kneel, and crawl; no concentrated exposure to noxious fumes or
> odors; perform only unskilled and low semi-skilled work; only
> occasional interaction with co-workers; and no interaction with the
> general public.

AR 23. Baldwin first argues that the ALJ's finding that Baldwin could "climb ramps and stairs and crouch, kneel and crawl up to one-third of the day" was erroneous. Pl.'s Br., ECF 18 at 14. Baldwin contends that this finding is entirely inconsistent with the finding that Baldwin could only stand for two hours total in a given workday. *Id.* The ALJ based this portion of Baldwin's RFC on the physical RFC completed by Dr. Alley. Dr. Alley used the designation "occasionally," which "means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)." AR 436. Dr. Alley also stated in his evaluation, however, that Baldwin was generally limited to sedentary work. AR 443. In light of this, the ALJ found that Baldwin could "occasionally," *i.e.* up to one-third of a workday and not continuously, engage in climbing ramps and stairs and crouch, kneel and crawl. AR 23. The "occasionally" designation, therefore, does not necessarily indicate engaging in an activity for more than two hours. Therefore, this designation is not undermined by the fact that Baldwin was limited to walking and standing for no more than two hours in an eight-hour workday. Further, the hypothetical to the VE ultimately focused on jobs that were sedentary, and thus would involve limited movement on the part of Baldwin. AR 57-59. Therefore, the ALJ's RFC formulation and hypothetical to the VE are supported by substantial evidence.

Baldwin's second argument is that the RFC failed to account for Baldwin's "marked" limitations in social functioning, cognitive limitations, and impulsivity control as documented by

Dr. Jill Spendal, PsyD. Dr. Spendal completed an evaluation of Baldwin, and in the "social interaction" section of the report, noted that Baldwin's abilities were "all variable," ranging from "not significantly limited" to "markedly limited." AR 435. In her written evaluation, Dr. Spendal explained that Baldwin "was observed to get along well with other co-workers; she appeared to be able to joke with them." AR 422. Dr. Spendal did note that on a different day when the evaluator was at the same DHS branch testing another individual, Baldwin gave the evaluator a "big hug and stated she had some old testing records to give her." *Id.* Dr. Spendal concluded that the "hug may be an example of questionable personal boundaries at times." *Id.* After conducting a mental status exam, Dr. Spendal concluded that Baldwin was "currently able to function appropriately in the workplace." AR 431. Dr. Spendal based this conclusion on the fact that Baldwin had worked at DHS for nine months on a nearly full-time basis and because she had a lengthy prior work history. *Id.* Dr. Spendal found that Baldwin's personality factors' influence on her work would "depend on how much she has to interact with others in the workplace and how she feels about those she works with." *Id.* Dr. Spendal cautioned that although Baldwin was "capable of workplace success," she will "have periods of time where her life outside work will influence her ability to do her job effectively." AR 432. The ALJ gave this opinion significant weight. AR 26.

The ALJ's RFC formulation is consistent with Dr. Spendal's medical opinion. Baldwin was limited to unskilled and low semi-skilled work, limited interaction with co-workers, and no interaction with the public. AR 23. These limitations reflect Dr. Spendal's finding that Baldwin has adult intelligence between "the high end of the Low Average Range and the low end of the Average range," AR 425, that Baldwin can interact with her coworkers, AR 431-32, and that the

"marked limitations" were noted as "variable," AR 435. The ALJ's RFC formulation is therefore supported by substantial evidence in the record.

Baldwin's third and final argument challenging her RFC is that the ALJ failed to incorporate her impairment in concentration. Pl.'s Br., ECF 18 at 15. The hypotheticals the ALJ provided to the VE included the questions of whether a person could maintain competitive employment if they missed two or more days a month or had lapses in concentration that interfered with and rendered productivity 80 percent of that of a normal worker. AR 59. The VE responded that such limitations would interfere with Baldwin's ability to maintain employment. *Id.* Baldwin cites to her testimony regarding her limitations and Dr. Spendal's mental impairments as evidence that her concentration is significantly limited. Regarding Baldwin's testimony, the ALJ's conclusion that Baldwin's activities of daily life and medical records undermined the credibility of her testimony was supported by substantial evidence. Thus, the ALJ was not required to incorporate this testimony into Baldwin's RFC. Next, Dr. Spendal found that in the area of sustained concentration and persistence, Baldwin was "not significantly limited" in all areas except in her "ability to sustain an ordinary routine without special supervision" and "ability to work in coordination with or proximity to others without being distracted by them." AR 435. Baldwin's RFC, which provided for occasional interaction with coworkers and a designation for unskilled and low semi-skilled work encompasses these limitations. Therefore, the ALJ did not err in not adding additional limitations related to concentration to Baldwin's RFC.

The ALJ's RFC formulation is consistent with the medical records and with the assessment of the treating and reviewing physicians. AR 416-35, 436-41. As a result, the hypothetical the ALJ provided to the VE accounted for all of Baldwin's limitations and was,

therefore, not defective. *See Valentine*, 574 F.3d at 690.  The Court finds the ALJ properly weighed the evidence, gave sufficient justification for his findings regarding Baldwin's functional abilities, and that there is substantial evidence in the record supporting the ALJ's conclusions.

## CONCLUSION

The Commissioner's decision that Baldwin is not disabled is AFFIRMED

**IT IS SO ORDERED**.

DATED this 9th day of May, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge